The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| ZENWORK, INC. f/k/a TECHATLANTIS, INC.,<br><br>          Plaintiff,<br><br>   v.<br><br>AVALARA, INC.,<br><br>          Defendant. | NO. 2:16-cv-01325-RAJ<br><br>DECLARATION OF MARSHAL KUSHNIRUK IN SUPPORT OF MOTION FOR ORDER OF POSSESSION OR IN THE ALTERNATIVE PRELIMINARY INJUNCTION |
| AVALARA, INC.,<br><br>          Counterclaim Plaintiff,<br><br>   v.<br><br>ZENWORK, INC. f/k/a TECHATLANTIS, INC. d/b/a EXAKTO.COM; 1099ONLINE.COM, TAX1099.COM; EZ2290; EZIFTA; EZEXTENSION; and FBARONLINE,<br><br>          Counterclaim Defendants. | |

DECLARATION OF MARSHAL KUSHNIRUK - 1
No. 2:16-cv-01325-RAJ

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

I, Marshal Kushniruk, declare as follows:

1. I am Executive Vice President of Global Business Development for Avalara. I have personal knowledge of the facts set forth below and am competent to testify.

2. Avalara is a leading provider of cloud-based services that automate compliance with government tax reporting.

3. In 2014, Avalara sought to license technology from a third party that would allow it to provide its customers with an Avalara-branded service for preparing and filing IRS Form-1099s ("Avalara 1099").

4. In early 2014, Avalara became aware of TechAtlantis ("TA").

5. From the outset, Avalara became aware of many problems with TA's management of the Avalara1099 service, and received numerous complaints from Avalara1099 customers regarding inaccurate filings, late filings, and improper disclosure of confidential taxpayer information.

6. Avalara was required to take extensive remedial actions on behalf of Avalara1099 customers, and such remedial actions continue to this day.

7. Avalara made TA aware of these problems but TA failed to remedy them.

8. Avalara1099 customers need immediate access to their data so they can meet filing deadlines and respond to IRS audits, some of which appear to have been triggered by TA's errors.

9. Avalara is suffering irreparable harm to its business relationships and reputation by virtue of being unable to respond to these data requests.

10. It is critical that customers receive reliable access to their customer data notwithstanding the termination of a contract between Avalara and one of its partners like TA.

DECLARATION OF MARSHAL KUSHNIRUK - 2
No. 2:16-cv-01325-RAJ

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

11. Attached as Exhibit A is a true and correct copy of the Reseller Agreement entered between TA and Avalara effective November 24, 2014. Under that Agreement Avalara owns the "AVA Data," which the Agreement at section 1.8 defines as "all data created by, or otherwise stored and maintained in, the AVA Products or AVA Console."

12. In addition to providing that Avalara is the owner of the AVA Data, the Agreement at section 10.4 provides that, after the expiration of the Wind-Down Period, TA was required to "promptly return, or, upon request, certify as destroyed, to [Avalara] all Confidential Information . . . of such other Party that remain in its possession." The Agreement at section 7.3 further provides that the AVA Data is Avalara's "Confidential Information."

13. The Wind-Down Period ended on September 30, 2016. But TA has refused to return "all Confidential Information" to Avalara; specifically it has refused to return the AVA Data and is wrongfully withholding it.

14. TA did not take the AVA Data for a tax, assessment, or fine pursuant to a statute and has not seized it under an execution or attachment against the property of Avalara.

15. The AVA Data has no market "value." It has significant unique "value" to the respective customers who also have a property interest in it (under section 7.3 of the Agreement), because these customers need reliable and quick access to their data to prepare tax forms and/or respond to IRS audits. It has significant unique value to Avalara because these customers direct their demands for their data to Avalara, and Avalara's inability to comply with those demands is causing harm to its reputation and customer relationships.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge.

DECLARATION OF MARSHAL KUSHNIRUK - 3
No. 2:16-cv-01325-RAJ

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

Dated December 14, 2016


Marshal Kushniruk

DECLARATION OF MARSHAL KUSHNIRUK - 4
No. 2:16-cv-01325-RAJ

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

**CERTIFICATE OF SERVICE**

I hereby certify that on December 15, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

> Michelle Peterson
> Michelle Peterson Law, PLLC
> 1420 Fifth Avenue, Suite 2200
> Seattle, WA 98101
> michelle@michellepetersonlaw.com
>
> Suzanne G. Clark
> Clark Law Firm, PLLC
> 244 W. Dickson St., Suite 201
> P.O. Box 4248
> Fayetteville, AR 72702-4248
> sclark@clark-firm.com

DATED this 15th day of December, 2016.

> _s/ Jeffrey M. Thomas_
> Jeffrey M. Thomas, WSBA #21175

DECLARATION OF MARSHAL KUSHNIRUK - 5
No. 2:16-cv-01325-RAJ

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

*Exhibit A*

## RESELLER AGREEMENT

This Reseller Agreement (the "Agreement") is between Avalara, Inc., a Washington corporation with headquarters at 100 Ravine Lane N.E., Suite 220, Bainbridge Island, Washington 98110 (together with its Affiliates, "AVA") and TechAtlantis, Inc., an Arkansas corporation with headquarters at 320 N. Rollston Ave., Suite 103-B, Fayetteville, AR 72701 (together with its Affiliates, "Partner"), and is effective as of November 24, 2014 (the "Effective Date").

### RECITALS

A.   AVA is a leading provider of cloud-based services that automate compliance with government taxes, including a web-based sales and use tax calculation solution, sales and use tax returns preparation and filing services, exemption certification management services, sales and use tax consulting services such as nexus analysis, registration services, voluntary disclosures and audit defenses, and other related tax products and services described at www.avalara.com/products, as updated from time to time (collectively, the "AVA Products").

B.   Partner provides a web-based service, marketed as "Tax1099," that solicits IRS W-9 information; imports payment data through both file import and custom integrations; and manages the creation, validation, filing and distribution of completed IRS 1099 forms.

C.   Partner seeks a strong sales and marketing partner to increase sales and usage of the Tax1099.com service, while AVA seeks a partner to provide a competitive web-based IRS 1099 technology to market its brand. Accordingly, Partner will create and operate an AVA-branded version of its Tax1099 Service which AVA will promote, sell and support as "Avalara1099" (further defined in Section 2.1).

### AGREEMENT

In exchange for the mutual services, fee sharing and other consideration afforded to each Party under this Agreement, the Parties agree to the following:

1.   **DEFINITIONS.**

   1.1   "Affiliates" means, with respect to a Party, its management, employees, agents, affiliates, consultants, subcontractors and any person or entity that controls, is controlled by, or is under common control with that Party. For the purpose of this definition, "control" shall refer to: (a) the possession, directly or indirectly, of the power to direct the management or policies of an entity, whether through the ownership of voting securities, by contract or otherwise, or (b) the ownership, directly or indirectly, of 50 percent or more of the entity's voting securities.

   1.2   "Agreement" means this Reseller Agreement, together with all Schedules, Exhibits and amendments hereto.

   1.3   "Administrative Console" means the user interface provided by AVA to its customers.

   1.4   "AVA Competitor" means those entities set forth in Exhibit C.

   1.5   "AVA Customer" means any and all Customers of any AVA Product (including, without limitation, the AVA-branded Tax1099 Service).

   1.6   "AVA Data" means all data created by, or otherwise stored and maintained in, the AVA Products or AVA Console.

This document contains confidential and proprietary information intended solely for use by Partner and AVA and for the sole purpose of discussing a possible business relationship between the two. It may not be disclosed to other parties or used for other purposes without the prior written consent of both AVA and Partner.

**1.7** "**Confidential Information**" means information that the disclosing Party considers to be confidential or proprietary, including business and technical information, trade secrets, source code, marketing plans, customer lists, customer data, supplier lists and information, research, designs, plans, methods, techniques, processes and know-how, whether tangible or intangible and whether or not stored, compiled or memorialized physically, electronically, graphically or in writing. Confidential Information shall not include information which: (a) is, as of the time of its disclosure to the receiving Party or thereafter becomes part of the public domain through a source other than the receiving Party; (b) was rightfully known to the receiving Party as of the time of its disclosure; (c) is independently developed by the receiving Party by its employees having no access to, and without use of or reference to, the Confidential Information; (d) is subsequently learned from a third party not under a confidentiality obligation to the disclosing Party; or (e) is required to be disclosed pursuant to a duly authorized subpoena, court order, or government authority, whereupon the Party subject to same shall provide prompt written notice to the other Party prior to such disclosure, so that such Party may seek a protective order or other appropriate remedy.

**1.8** "**Level 1 Support**" means the initial support level responsible for basic customer issues, which includes problem intake and general guidance in the use of major features of the product or service.

**1.9** "**Level 2/3 Support**" means all more in-depth technical support level than Level I, including troubleshooting technical problems and for investigating elevated issues by confirming the validity of the problem and seeking for known solutions related to these more complex issues, including product engineering issues.

**1.10** "**Marks**" means the name, trademarks, service marks, trade names, and logos of each Party.

**1.11** "**Renewal Term**" means the twelve (12) month period following the Initial Term or any expiring Renewal Term of this Agreement if this Agreement is renewed by its terms.

**1.12** "**Term**" means the Initial Term, as well as any Renewal Term.

**1.13** "**Wind-Down Period**" has the meaning set forth in Section 10.

**2.    ENGINEERING AND HOSTING.**

**2.1** Partner will create a "white label" instance of the Tax1099 service with AVA branding in accordance with a mutually-agreeable design and delivery schedule, ensuring that Avalara1099 includes all of the features and functionality of Tax1099 (including, without limitation, its support for individual business, accountant and accounting firm users) ("Avalara1099") Partner will also use commercially reasonable efforts to ensure that any software updates, enhancements or new features released to Tax1099 customers are released to Avalara1099 customers at the same time. To the extent software updates, enhancements or new features are not released to Avalara1099 customers at the same time, Partner will ensure that such updates, enhancements or new features are released as soon as practicable thereafter, but in no case more than three (3) business days following such release.

**2.2** Partner warrants that the Tax1099 service: (a) complies (and will continue to comply) with all applicable state and federal laws and regulations, including without limitation, those laws and regulations relating to privacy and the protection of sensitive data; and (b) is approved (and will remain approved) by the US Internal Revenue Service to provide the Tax1099 Services that require IRS approval (e.g., electronic 1099 filing and tax identification number validation).

**2.3** Partner will provide to AVA a file format to be used to load client data to Avalara1099. AVA will capture the data from its connectors needed to complete an import file in the format provided.

This document contains confidential and proprietary information intended solely for use by Partner and AVA and for the sole purpose of discussing a possible business relationship between the two. It may not be disclosed to other parties or used for other purposes without the prior written consent of both AVA and Partner.

Partner will provide a programmatic interface with necessary technical documentation to AVA to successfully upload data into Avalara1099.

2.4   Partner will release Partner-developed integrations to Avalara1099 customers at approximately the same time as they are offered to Tax1099 customers. Integrations will be provided at no cost and will, at Partner's discretion, include branding to note Partner ownership. For the avoidance of doubt, the parties acknowledge and agree that nothing in this Agreement will prohibit or limit Partner from developing any integration and/or other product development at its exclusive discretion.

2.5   Partner will host, operate and maintain Avalara1099 at its sole expense and in accordance with the Service Level Agreement (SLA) set forth in Exhibit A.

3.   INFORMATION SECURITY, INTERNAL CONTROLS AND AUDITS.

3.1   Partner will separate the data obtained from Avalara1099 (i.e. the AVA Data) from data obtained through its other Tax1099 Service channels, and will make the AVA Data available to AVA on a real-time basis.

3.2   Partner will implement controls to ensure access to Avalara1099 data is restricted solely to authorized staff who must have access to it, including without limitation, completing an SSAE-16 audit within nine (9) months of execution of this Agreement and then annually thereafter. The SSAE-16 audit report will include, at a minimum, the development, testing, operation, security, reliability and redundancy, including elements provided by third-parties under contract to Partner. Within thirty (30) days of each audit completion, Partner will provide a copy of the complete audit findings to AVA. Partner will maintain a current SSAE-16 and will furnish updated audit results to AVA as it receives them, and respond promptly to reasonable requests for information related to its SSAE-16.

3.3   Partner will permit AVA to audit and inspect Partner facilities upon AVA's reasonable request, at AVA's expense and by providing Partner with at least 15 days' prior notice. Additionally, will Partner will immediately notify AVA of any event, information or condition that causes, or may reasonably cause, an adverse effect on the security, reliability, functionality, legal or regulatory compliance of Avalara1099.

3.4   Partner acknowledges the any breach of this Section 3 could have a severe adverse impact on AVA and its Customers, and constitute a breach allowing AVA to terminate as set forth in Section 10, with or without a cure period depending on the nature of the security breach.

4.   MARKETING AND PROMOTIONS.

4.1   During the Term, AVA will use commercially reasonable efforts to develop (in conjunction with Partner) a marketing plan for offering Avalara1099 to its existing and prospective Customers. AVA will market and promote the Product, in addition to invoicing and collecting payment directly from AVA Customers and remit to Partner the portion of such amounts actually collected by AVA [or its distributors] from such AVA Customers in accordance with the fee sharing schedule set forth in Section 5.

4.2   Partner will provide AVA with Avalara1099 account registration and usage information, in addition to all Partner marketing collateral and content that is reasonably necessary for the marketing and sale of Avalara1099, in a format and frequency reasonably requested by AVA. Partner will also present AVA as its preferred partner for products offered by AVA which do not compete with products offered by Partner. Conversely, AVA will present Partner as its preferred partner for products offered by Partner which do not compete with products offered by AVA.

4.3   The Parties agree to issue a joint press release announcing their relationship within thirty (30) days of the execution date of this Agreement. The content of this joint press release will be approved by both Parties and the Parties agree that such approval shall not be unreasonably withheld.

This document contains confidential and proprietary information intended solely for use by Partner and AVA and for the sole purpose of discussing a possible business relationship between the two. It may not be disclosed to other parties or used for other purposes without the prior written consent of both AVA and Partner.

Neither Party may issue additional press releases about the relationship without the other Party's advance, written consent. The parties may pursue other joint marketing or promotion activities, as mutually agreed upon. Unless otherwise agreed, each party will bear the cost of its own involvement in these activities.

5. **PAYMENT TERMS; MOST FAVORED STATUS.**

   5.1   **Exclusivity.** AVA will have a non-exclusive right to market and sell Avalara1099 in any market, provided that Partner shall not permit AVA Competitors to resell Tax1099 Service. Except as expressly set forth in this Agreement (including the foregoing sentence), Partner will not be subject to any restriction or limitation in connection with the marketing and sale of Tax1099 in any market. AVA will not engage any third party during the Term to provide the products or services offered through Avalara1099.

   5.2   **Pay-For-Use Sales.** Avalara1099 will offer an equivalent online "pay-for-use" payment feature that is offered to Tax1099 customers. Partner will modify its online payment process so that AVA is made the "merchant of record" for these sales, that AVA is notified when orders are placed, and that payments collected at the Avalara1099 site are deposited into account(s) provided by AVA. The Avalara1099 pay-for-use pricing will be no greater than pricing offered to Tax1099 pay-for-use customers. On a monthly basis, Partner will invoice AVA for 40% of e-File (including, but not limited to, IRS 1099 forms), Tax Identification Number (TIN) validation, IRS W-9 solicitation, and Enterprise Subscription fees; and 80% of form print and mail fees collected at the Avalara1099 site. All amounts owed to Partner under this Section 5.2 will accrue upon the delivery of the foregoing products.

   5.3   **Prepaid Forms Sales.**

       5.3.1   AVA may sell Avalara1099 Prepaid Forms through channels other than the Avalara1099 website. AVA will set customer pricing, process orders, collect payment and process all cancellations with respect to the Avalara1099 Prepaid Forms. AVA will provision Avalara1099 accounts for Avalara1099 Prepaid Forms through a mutually-agreeable process to be defined.

       5.3.2   Partner will record the sale of Avalara1099 Prepaid Forms from April 1st of each year through March 31st of the following year (the "Sales Year"). AVA will pay Partner $0.60 for the first 200,000 Avalara1099 Prepaid Forms ordered from Partner each Sales Year and $0.45 for each Avalara1099 Prepaid Form above 200,000 each Sales Year. In addition, AVA will pay Partner $1.00 for each Avalara1099 Prepaid Form that Partner mails through the Tax1099 Print-and-Mail service. AVA shall pay Partner an annual fee of $75 for each customer that purchases Enterprise services (i.e., enterprise workflow and rights management features). This price schedule will also apply to orders placed by AVA between October 1, 2014 and March 31, 2015. All amounts owed to Partner under this Section 5.3.2 will accrue upon the delivery of the foregoing products regardless of the time of collection by AVA and will be paid by AVA to Partner on a monthly basis.

   5.4   **Pricing Terms; Most Favored Status.**

       5.4.1   Pricing is subject to annual review and Partner shall notify AVA of price changes at least 60 days prior to the beginning of each Sales Year. Price increases for Prepaid Forms will be capped at five percent (5%) per Sales Year. Partner' Avalara1099 Prepaid Forms pricing to AVA includes single form Federal and State eFiling and unlimited TIN Validation and W-9 solicitation services, and multi-user support but does not include enterprise workflow or rights management.

       5.4.2   Pricing may be adjusted at any time to ensure Partner' pricing to AVA is no less favorable than pricing offered by Partner to its own customers or offered to Partner partners doing comparable per form sales volume.

       5.4.3   Partner will invoice AVA for its revenue share and prepaid form fees on a monthly basis. Payments shall be due on "Net 30-day" terms from AVA's receipt of invoice. The parties

This document contains confidential and proprietary information intended solely for use by Partner and AVA and for the sole purpose of discussing a possible business relationship between the two. It may not be disclosed to other parties or used for other purposes without the prior written consent of both AVA and Partner.

shall perform reconciliations on accounts and payments on mutually agreeable schedule. Payments shall be net any cancellations and returns; provided that (i) the parties will do a cash reconciliation every 6 months; and (ii) AVA will not be entitled to a refund of payments already made to Partner, but reconciliations will be treated as credits against AVA's continuing payment obligations on a carry forward basis.

5.5     Channel Commissions: AVA shall be solely responsible for paying incentive compensation to AVA employees, contractors and channel partners for sales of Avalara1099.

6.     CUSTOMER PROVISIONING & SUPPORT.

6.1     Partner will provide AVA Level 1 Support through December 31, 2014 by making a resource available to join inbound support calls to AVA or to provide assistance handling inbound email or chat requests sent to AVA.. After December 31, 2014, AVA will provide Level 1 Support to Avalara1099 customers, while Partner will provide responsive Level 2/3 Support to AVA. In providing Level 2/3 Support, Partner: (a) will provide services (response, action and resolution times, in accordance with the terms set forth in Exhibit B; and (b) may be required to participate in joint customer calls as Avalara deems required in servicing escalated customer inquiries and/or where specific Partner-expertise is required.

6.2     Partner will provide reasonable user training to AVA support associates each Sales Year in accordance with a mutually-agreeable training plan and schedule. Partner will provide AVA with access to recorded webinars, handouts, and other materials relevant to Avalara1099 that Partner creates for internal use, and will also provide public facing training and support information to be rebranded or edited by Avalara (such as training webinars, on-demand videos, user guides, FAQ's or knowledge base articles). AVA will reimburse Partner for travel expenses in the event of in-person training provided by Partner to AVA.

6.3     Each party hereby designates the following as their respective primary escalation or support management contacts:

| TECHATLANTIS: | AVALARA: |
| --- | --- |
| Name: Ed Pratt | Pamela Knudsen |
| Title: Vice President | Senior Manager, Customer Support |
| Email: Ed@techatlantis.com | pamela.knudsen@Avalara.com |
| Phone: 479-935-1722 or 443-379-7227 | 206-826-4900 ext.1039 |

7.     INTELLECTUAL PROPERTY RIGHTS.

7.1     No Transfer of Intellectual Property Rights. Each party retains ownership in the intellectual property it owned prior to entering this agreement and, unless otherwise agreed in writing, each party will retain rights in any new Tax1099 Connectors it develops during the term of this agreement. No intellectual property rights shall be transferred under this Agreement. All intellectual property rights owned by AVA shall remain with AVA and all intellectual property rights owned by Partner shall remain with Partner. AVA retains all ownership and intellectual property rights in and to the AVA Products and Partner retains all ownership and intellectual property rights in and to Avalara1099. Neither Party will have any right to use the other Party's software, proprietary intellectual property or other confidential information for any purpose other than to (a) accomplish the integration of their technology systems for the performance of this Agreement, or (b) provide service to shared customers.

7.2     Co-Development. The Parties do not anticipate any co-development. But in the event of any co-development by the Parties, the Parties will specifically set forth the terms of any such works in an Addendum, and will jointly own such co-developed intellectual property, and both parties will own all right,

This document contains confidential and proprietary information intended solely for use by Partner and AVA and for the sole purpose of discussing a possible business relationship between the two. It may not be disclosed to other parties or used for other purposes without the prior written consent of both AVA and Partner.

title and interest in and to the same and may use and access the same for whatever reason and purpose they desire; except that following expiration of the Wind-Down Period, neither Party has the obligation to provide any updates or ongoing technical support, unless such Party has been engaged by the other Party to provide such support pursuant to a Professional Services Agreement and Statement of Work containing mutually agreed terms. In the absence of the aforementioned Addendum, no works will be deemed a co-development and, notwithstanding anything in this Agreement that may be interpreted to the contrary, no connectors to Tax1099 developed by either Party shall be deemed a co-development.

7.3     **AVA Customer Data and AVA Data.** Each AVA Customer will own all rights in and to the AVA Data provided by such Customer in the course of using the AVA Products or Avalara1099 and each Party will have the right to use such data to the extent permitted by such AVA Customer in the applicable end user agreement, provided such use is in accordance with applicable law. AVA (or the respective AVA Customer) retains all ownership rights to the AVA Data and such AVA Data shall be deemed AVA's Confidential Information. Partner may review and use aggregated AVA Data for the purpose of determining the type and frequency of customer purchases and decisions with respect to the various individual products offered under Avalara1099. In return, Partner will provide such analysis to Avalara in consideration for contributing data. Partner may not use the AVA Data for other marketing, aggregation or other business intelligence purposes.

7.4     **Trademarks; End User Agreements.** Each Party is the sole and exclusive owner of its Marks and each Party must obtain other Party's approval prior to use of the other Party's Marks. All AVA Customers' use of the Avalara1099 (and any other AVA Products) shall be governed by, and subject to the terms of, AVA's then-current Terms & Conditions found at http://www.avalara.com/terms/, which may be amended from time to time, in its sole discretion.

8.     **Confidential Information.** Each Party agrees to secure and protect the Confidential Information of the other in a manner consistent with the maintenance of the other Party's rights therein, using at least as great a degree of care as it uses to maintain the confidentiality of its own Confidential Information of a similar nature, but in no event using less than a reasonable standard of care. Neither Party will sell, transfer, publish, disclose, or otherwise make available any portion of the Confidential Information of the other Party to third parties, except as necessary to perform its obligations under this Agreement or as expressly authorized by the other Party.

9.     **NON-SOLICITATION.**

9.1     **Non-Solicitation of AVA Customers.** During the Term of this Agreement and for the duration of the Wind-Down Period (as defined below), Partner agrees that it will not solicit any AVA Customer (the "Partner Non-Solicitation Obligation"); provided, however, that Partner may offer to renew any existing agreement for the purchase of Tax1099 if such AVA Customer purchased Tax1099 during the Term or the Wind-Down Period.

9.2     **Remedies.** If Partner violates this Section 9, AVA may, in its discretion and following notice to Partner (with a 30-day period for Partner to cure such breach): (a) offset from amounts due by AVA to Partner under the Agreement the value of products or services not sold by AVA to the AVA Customer as a result of the AVA Customer purchasing from Partner or an AVA Competitor; (b) terminate the Agreement (including any Wind-Down Period) effective immediately; and/or (c) pursue any other legal remedies.

10.     **TERM; TERMINATION.**

10.1     **Term.** The Initial Term of this Agreement will run from the Effective Date to March 31, 2016. Upon expiration of the Initial Term, the Term of this Agreement will automatically renew for successive twelve (12) month Renewal Terms, unless: (a) the Agreement is terminated earlier in accordance with the provisions of this Section 10 or (b) one Party gives written notice to the other Party of its intent not to renew the Agreement at least sixty (60) days prior to the last day of the Initial Term or any Renewal Term, which notice shall be effective on the last day of the current Term.

This document contains confidential and proprietary information intended solely for use by Partner and AVA and for the sole purpose of discussing a possible business relationship between the two. It may not be disclosed to other parties or used for other purposes without the prior written consent of both AVA and Partner.

10.2     **Termination for Cause.** In addition to the right to give notice of non-renewal, as set forth above in Section 10.1(b), the Agreement may be terminated by either Party:

   10.2.1  If a Party has committed a material breach of the Agreement, upon written notice by the non-breaching Party describing in reasonable detail the material breach, which breach, if capable of being cured, is not cured within thirty (30) days of receipt of such notice, provided that breach of the Customer non-solicitation provisions of Section 9.1 above or the provisions of Section 8 regarding Confidentiality, the period for cure shall be ten (10) days following receipt of notice of breach of such Section;

   10.2.2  Immediately if the other Party terminates or suspends its business by completely ceasing or suspending all of such Party's operations; or

   10.2.3  Immediately if the other Party becomes insolvent; admits in writing its inability to pay its debts as they mature; makes an assignment for the benefit of creditors; becomes subject to direct control of a trustee, receiver or similar authority; or becomes subject to any bankruptcy or insolvency proceeding that is not rescinded within forty-five (45) days of the commencement of such proceeding.

10.3     **Post-Termination Wind-Down Period.** Upon termination of this Agreement, the Parties will immediately enter a six-month Post-Termination Wind-Down Period. The following terms shall apply during this Wind Down Period:

   10.3.1  Neither Party shall accept new accounts for Avalara1099.

   10.3.2  Neither Party shall accept new orders, renewals or Pay-As-You-Go prepayments for Avalara1099.

   10.3.3  AVA and Partner shall work in good faith to promptly create a reconciled list of AVA Customers who purchased Avalara1099 Prepaid Contracts or Pay-As-You-Go services in the 12 months prior to the Termination Date. AVA and Partner will ensure that these AVA Customers are able to retrieve their data from Avalara1099.

   10.3.4  AVA will refund any Prepaid Contract or Pay-As-You-Go prepayment amounts due AVA Customers.

   10.3.5  AVA will continue to provide Level 1 Support to AVA Customers. Partner will continue to provide Level 2/3 support to AVA.

   10.3.6  Partner will continue to provide technical support to AVA during the Wind-Down Period with respect to issues with Avalara1099 pursuant to the support provisions set forth above in Section 6.1;

   10.3.7  During the Wind-Down Period, each Party will continue to pay the other Party any amounts due to such Party per the Agreement. The Parties shall complete a final reconciliation of accounts and payments within thirty (30) days of the end of the Wind-Down Period.

10.4     **Return of Confidential Information.** Upon Termination, each Party shall promptly return or, upon request, certify as destroyed to the other Party all Confidential Information, papers, materials and other properties of such other Party except to the extent necessary to perform such Party's obligations during the Wind Down Period. Following the Wind Down Period, each Party shall promptly return or, upon request, certify as destroyed, to the other Party all Confidential Information, papers, materials and other properties of such other Party that remain in its possession.

10.5     **Survival.** The following provisions will survive the Termination of this Agreement: Sections 1, 8, 9 and 11.

This document contains confidential and proprietary information intended solely for use by Partner and AVA and for the sole purpose of discussing a possible business relationship between the two. It may not be disclosed to other parties or used for other purposes without the prior written consent of both AVA and Partner.

## 11. OTHER TERMS.

**11.1   ASSET SALE OR MERGER; RIGHT OF REFUSAL.** During the Term, AVA shall have first right of refusal to purchase Partner or any of its assets in the event Partner makes those assets available for purchase. During the Term, Partner shall provide AVA with written notice of its intent to accept offers before soliciting offers from others. During the Term, if Partner receives a binding, bona fide offer from a third party, AVA will have 30 days to match the offer and be awarded the sale.

**11.2   Warranties.** Each Party represents and warrants to the other Party that: (a) it has the right to enter into the Agreement and the relationship and transactions contemplated under this Agreement; (b) its respective product will materially conform to its specifications, description and other documentation; (c) it will provide its respective service in a professional manner and in accordance with applicable industry standards for such respective service; and (d) the Party's Product and/or Service does not infringe the intellectual property or other proprietary rights of any third party.

**11.3   Indemnification.** Except to the extent arising from the other Party's gross negligence or willful misconduct, each Party will defend and indemnify the other party from and against any third-party claims (including, but not limited to, claims brought by AVA Customers), arising from such Party's own negligence, breach of this Agreement, or violation of a third party's intellectual property.

**11.4   LIMITATIONS OF LIABILITY.**

11.4.1   TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY CONSEQUENTIAL, INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL, EXEMPLARY OR LOST PROFITS DAMAGES OF ANY KIND, WHETHER FORESEEABLE OR UNFORESEEABLE (SUCH AS DAMAGES FOR LOSS OF DATA, GOODWILL, INVESTMENTS, USE OF MONEY OR USE OF FACILITIES, INTERRUPTION IN USE OR AVAILABILITY OF DATA, STOPPAGE OF OTHER WORK OR IMPAIRMENT OF OTHER ASSETS), EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, ARISING OUT OF (I) THE PERFORMANCE OR NONPERFORMANCE OF THIS AGREEMENT OR OF PRODUCTS, SOFTWARE OR SERVICES PROVIDED UNDER THESE TERMS, OR (II) ANY CLAIM, CAUSE OF ACTION, BREACH OF CONTRACT, INDEMNITY, OR ANY EXPRESS OR IMPLIED WARRANTY, UNDER THESE TERMS OR OTHERWISE, MISREPRESENTATION, NEGLIGENCE, STRICT LIABILITY, OR OTHER TORT.

11.4.2   EXCEPT TO THE EXTENT OF EACH PARTY'S INDEMNIFICATION OBLIGATIONS, EACH PARTY'S TOTAL LIABILITY TO THE OTHER WILL BE CAPPED AT THE AMOUNT PAID TO PARTNER BY AVA DURING THE SIX (6) MONTH PERIOD PRECEDING THE EVENT GIVING RISE TO A CLAIM, EXCEPT THAT THE FOREGOING CAP ON LIABILITY SHALL NOT APPLY TO (a) DIRECT DAMAGES INCURRED BY A PARTY IF THE OTHER PARTY BREACHES ITS NON-SOLICITATION OBLIGATIONS OR LICENSE RESTRICTIONS.

**11.5   Governing Law and Venue.** The Agreement will be governed by, and interpreted in accordance with, the laws of the state of Washington, without regard to its conflict of laws principles. The parties agree that venue with respect to any dispute between the parties concerning the Agreement shall be proper only in (at the election of the Party bringing suit) an appropriate federal or state court sitting in King County, Washington State, U.S.A. THE PARTIES HEREBY WAIVE ALL OBJECTIONS OF FORUM NON CONVENIENS AND VENUE.

**11.6   Taxes.** All amounts payable hereunder are exclusive of all sales, use, value added and other taxes or duties and each Party shall collect and pay all such taxes with respect to sales of its Products/its sales, whether of its own Products or the other Party's Products.

This document contains confidential and proprietary information intended solely for use by Partner and AVA and for the sole purpose of discussing a possible business relationship between the two. It may not be disclosed to other parties or used for other purposes without the prior written consent of both AVA and Partner.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

| AVALARA, INC. ("AVA") | TECHATLANTIS INC. ("PARTNER") |
|---|---|
| Name: Greg Chapman | Name: Ed Pratt |
| Title: VP BD | Title: Vice President of Business Development |
| Signature: [signature] | Signature: Ed Pratt |
| Date: 11/24/14 | Date: 11/24/14 |

This document contains confidential and proprietary information intended solely for use by Partner and AVA and for the sole purpose of discussing a possible business relationship between the two. It may not be disclosed to other parties or used for other purposes without the prior written consent of both AVA and Partner.

## EXHIBIT A

### SERVICE LEVEL AGREEMENT GOVERNING SERVICE AVAILABILITY

1. **Avalara1099 Service Credits.** If the uptime availability percentage ("Availability Percentage") of Avalara1099 Service is below 99.5% during a given calendar month, as measured by third-party analytics vendor Nuestar Webmetrics (http://www.webmetrics.com) or any successor Partner vendor, subject to the terms and conditions of this Agreement, AVA will be entitled to a certain service credit in accordance with the schedule set forth below. The service credit shall be calculated as a percentage of total Monthly Fees (defined as follows). "Monthly Fees," means the total fees payable by AVA to Avalara under Section 5 of the Agreement for the Avalara1099 Service that has an Availability Percentage that's below 99.5% during a given calendar month.

| Availability Percentage | Avalara1099 Service Credit % |
|---|---|
| >98.5% but <99.5% | 4% of Monthly Fees |
| >97.5% but <98.5% | 6% of Monthly Fees |
| >96.0% but <97.5% | 10% of Monthly Fees |
| >94.0% but <96.0% | 20% of Monthly Fees |
| >90.0% but <94.0% | 30% of Monthly Fees |
| <90.0% | 50% of Monthly Fees |

2. Notwithstanding anything to the contrary in this Agreement, in no event will any amount of time a Avalara1099 Service is not accessible to AVA or otherwise functional as a result of any of the following be included in the determination of the Availability Percentage:

   a. AVA's error or negligence, including, but not limited to, the following situations: AVA has entered the Username or Password incorrectly or AVA is using or accessing the Avalara1099 Service not in accordance with the then-current and applicable manual, guide or other documentation;

   b. any scheduled maintenance or update of the Services, inclusive of the underlying Avalara1099 Service infrastructure;

   c. any event outside of Partner's control, including, but not limited to, power outages, utility failures or scheduled downtime by any applicable Partner data-center hosting subcontractor; or

   d. any failure of AVA's software (other than the Software licensed to AVA by Partner under this Agreement), hardware, or Internet service provider, telecommunications carrier or other service provider that provides AVA's services necessary to establish AVA's connection or access to the Internet.

3. Upon AVA's request, Partner will perform the research necessary to verify whether AVA is entitled to a service credit under this Agreement and apply the appropriate service credit to AVA's following invoice. If requested by AVA, Partner will provide AVA an Availability Percentage report for the Avalara1099 Service at issue for the applicable calendar month within 10 business days of Partner's receipt of a written request from AVA. Such Availability Percentage report shall be deemed Partner's Confidential Information.

This document contains confidential and proprietary information intended solely for use by Partner and AVA and for the sole purpose of discussing a possible business relationship between the two. It may not be disclosed to other parties or used for other purposes without the prior written consent of both AVA and Partner.

## EXHIBIT B

## GOVERNING TECHATLANTIS LEVEL 2 SUPPORT TO AVALARA

1) **Partner Support Service:** Partner will provide responsive Level 2/3 Support to AVA with respect to Avalara 1099 based on Severity Levels 1-4 (listed below). Partner Support Service consists of (i) Support on a 24 hours per day, 7 days per week, 365 days per year basis; and (ii) support with respect to Errors as set forth in the Error Severity Definition Table below.

2) **Error Designation.** Partner's support personnel will (a) verify Errors detected by AVA Level 1 Support and (b) determine the severity of the support request and whether the support request is an S1, S2, S3, or S4 Error or not an Error.

3) **Error Response & Resolution.** Upon receipt of notice of an Error, Partner shall assign appropriate technical personnel to the issue and provide AVA with acknowledgment that it has received such Error notice (such actions together, a "Response"). Partner will use commercially reasonable efforts to promptly provide AVA with a Response to each case within one (1) hour. Partner will use commercially reasonable efforts to promptly resolve each case. Actual resolution time will depend on the nature of the case and the resolution. A resolution may consist of a fix, workaround, enhancement, or other solution in AVA's reasonable determination.

This document contains confidential and proprietary information intended solely for use by Partner and AVA and for the sole purpose of discussing a possible business relationship between the two. It may not be disclosed to other parties or used for other purposes without the prior written consent of both AVA and Partner.

## Error Severity Definition Table

| TechAtlantis Services | Severity 1 | Severity 2 | Severity 3 | Severity 4 |
|---|---|---|---|---|
| Current Description | System Outage. Pervasive functional/user work-blockage; affects multiple customers; no workaround.<br><br>This includes the following scenarios:<br>• The Avalara1099 Service is unusable and/or is severely impacting other critical business functions, and no workaround is available.<br>• The Avalara1099 is in a development environment and is nearing a critical milestone, is unusable, and no workaround is available. | Core Functionality Impaired; No Workaround. Some functional/user work blockage; no workaround. Does not typically affect multiple customers.<br><br>The reported issue affects core functionality and/or causes some performance degradation, and no workaround is available. Other product features are still functional. | Moderate Impact with Workaround. Some functional/user work blockage; complex workaround.<br><br>Issue has moderate or minor impact on usage, and product remains functional. This category may include enhancement requests, common how-to questions. | Minor Impact. Some functional/User work blockage; Simple Workaround.<br><br>Includes minor, cosmetic, or documentation-related issues, and enhancement requests that are not time-sensitive. There is no impact on the product's existing features. |
| Detailed Description | A failure of one or more elements of the Service that (a) renders Service unusable by Users or their Connector or (b) prevents access to the Service by Users or by their Connector for which no workaround is immediately available.<br><br>OR<br><br>(DEV/OPS) Severe latency or performance degradation such that the system is deemed unusable or unreliable. | A failure of one or more elements of the Service that is significantly affecting functionality of the Services such that a User or their Connector's ability to use the Service is significantly impaired, but such failure is not otherwise resulting in Services being unavailable to the User or their Connector<br><br>OR<br><br>(DEV/OPS) Significant latency or performance degradation, or sustained spikes in performance, such that the system is significantly impaired impacting business | A failure of one or more elements of the Service that is affecting functionality of the Services such that a User or their Connector's ability to use the Service is impaired, but such failure is not otherwise resulting in Services being unavailable to the User or their Connector | A failure of one or more elements of the Services that are affecting only minor functionality of the Services such that a User or their Connector's ability to use and access the Services is not materially affected. |
| Support Response | Immediate upon discovery | 1 Hour | 1 Hour<br>Within 5 business days of pending fix date | 1 Hour<br>Within 10 business days Prioritization |
| Dev Scoping and Prioritization velopment or Ops Action Time | Immediate upon report<br>15 Minutes | Immediate upon report<br>1 Hour | Prioritization | |
| Acceptable Workaround or Temporary Fix | 4 Hours | 1 Day | N/A | N/A |
| Permanent Fix | 5 days | 10 Days | Next Release Cycle | Prioritization |
| Root Cause Analysis | 48-72 hours | 48-72 hours | N/A | N/A |

This document contains confidential and proprietary information intended solely for use by Partner and AVA and for the sole purpose of discussing a possible business relationship between the two. It may not be disclosed to other parties or used for other purposes without the prior written consent of both AVA and Partner.

## EXHIBIT C

## LIST OF AVALARA COMPETITORS

1. Accurate Tax
2. CCH (Wolters Kluwer)
3. Cybersource
4. Exactor
5. Sales Tax Datalink
6. Second Decimal
7. Service Objects (FastTax)
8. TaxCloud
9. Taxjar
10. Taxware
11. Thompson Reuters
12. Vertex

This document contains confidential and proprietary information intended solely for use by Partner and AVA and for the sole purpose of discussing a possible business relationship between the two. It may not be disclosed to other parties or used for other purposes without the prior written consent of both AVA and Partner.