THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ZENWORK, INC. f/k/a TECHATLANTIS, INC.,<br><br>                      Plaintiff,<br><br>v.<br><br>AVALARA, INC.,<br><br>                      Defendant. | Case No. C16-1325 RAJ<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR ORDER TO SHOW CAUSE OR IN THE ALTERNATIVE FOR PRELMINARY INJUNCTION**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>NOTED: JANUARY 6, 2017 |

## I.   INTRODUCTION

Before the Court is a motion for an Order to Show Cause or In the Alternative for Preliminary Injunction by Defendant and Counterclaim Plaintiff, Avalara, Inc. ("Avalara"). The motion seeks the return of property by asserting a Washington cause of action for replevin. The motion should be denied. Avalara's request, while appearing simple on its face, is an attempt to force a small growing company to use its limited resources to service Avalara's customers without payment and without legal justification during the busy tax season. Avalara also fails to even acknowledge to the Court that it never plead a claim for replevin against TechAtlantis, Inc. ("TechAtlantis") while at the same time arguing that it is likely to succeed on the merits of that claim.

Avalara does not seek the return of property in the form of customer data. It wants TechAtlantis to develop a program that will allow it to create and produce numerous documents

RESPONSE TO MOTION FOR ORDER
TO SHOW CAUSE OR PRELIMINARY
INJUNCTION - 1

MICHELLE PETERSON LAW, PLLC
1420 FIFTH AVENUE, SUITE 2200
SEATTLE, WA 98101

required by a third-party customer of Avalara: H&R Block ("HRB"). The format for the "returned" data that Avalara seeks would require TechAtlantis to devote hundreds of hours during its busy tax season to develop a program to meet the very specific demands from Avalara for the benefit of Avalara's customers. The contract at issue in this motion does not require TechAtlantis to do this additional work.

## II.   FACTUAL BACKGROUND

### A.   The Agreement

On November 14, 2014, the parties entered into the Reseller Agreement ("Agreement") that is the basis of TechAtlantis's claims against Avalara. Complaint (Dkt. #1), Ex. A and Kushniruk Decl. (Dkt. #19), Ex. A. The purpose of the Agreement was to use TechAtlantis's proprietary tax product called Tax1099, which is an IRS-approved E-file provider for 1099 and other tax forms, for the benefit of Avalara's customers and marketed under Avalara's brand. Declaration of Ed Pratt ("Pratt Decl."), ¶ 2. TechAtlantis developed a private-labeled version of its Tax1099 product called Avalara1099. Pratt Decl., ¶ 7. Pursuant to the Agreement, TechAtlantis agreed to create and operate the Avalara-branded web-based 1099 service during the term of the Agreement. Pratt Decl., ¶6; Kushniruk Decl., Ex. A, Recital C and ¶ 2.1.

The Agreement required that Avalara1099 be hosted on a separate platform and that it be kept entirely separate from TechAtantis's Tax1099 product. *See* Kushniruk Decl., Ex. A, ¶¶ 2.5 & 3.1. The Agreement also required that Avalara have "real time" access to all customer data on the Avalara1099 platform. *Id.* at ¶3.1. At all times during the course of the Agreement, Avalara has had real-time access to the AVA Data. Pratt Decl., ¶ 7. TechAtlantis never withheld any customer data from Avalara. *Id.*

At the heart of this dispute is one of Avalara's largest customers, HRB. At the time the parties entered into the Agreement, however, HRB was not a customer of Avalara or

RESPONSE TO MOTION FOR ORDER
TO SHOW CAUSE OR PRELIMINARY
INJUNCTION - 2

MICHELLE PETERSON LAW, PLLC
1420 FIFTH AVENUE, SUITE 2200
SEATTLE, WA 98101

TechAtlantis. Pratt Decl., ¶ 11. TechAtlantis has never had an agreement of any kind with HRB. *Id.* TechAtlantis believes that Avalara entered into an agreement with HRB sometime in September 2015. *Id*. The HRB business resulted in a substantial increase in the volume of business to Avalara1099. *Id.* at ¶ 12.

### B.      TechAtlantis Terminates the Agreement for Nonpayment

From the beginning of the Agreement, Avalara was slow to pay TechAtlantis for work it performed under the Agreement. The lack of payment by Avalara was made worse by the fact that TechAtlantis was required to front the costs of postage and e-filing for Avalara's customers and it was not being reimbursed in a timely manner, if at all. Pratt Decl., at ¶¶ 13-14. By January 2016, it was impossible for TechAtlantis to continue to service Avalara's customers in the face of Avalara's delinquent payment obligations. TechAtlantis notified Avalara that it was terminating the Agreement. *Id.*, Ex. A. TechAtlantis was clear that its hope was that the parties could renegotiate the Agreement to address other payment options so that it did not have to constantly be chasing down payment on invoices from Avalara. *Id.* During the term of the Agreement, TechAtlantis had invoiced Avalara for more than $900,000 in fees and costs and had only been paid approximately $31,200 by Avalara. Pratt Decl., ¶ 13.

### C.      Parties Begin the Wind-Down Period

Per the Agreement, TechAtlantis's termination notice triggered a six-month Wind-Down Period. Kushniruk Decl., Ex. A, ¶ 10. The parties contemplated that, upon termination of the Agreement, Avalara and its customers would need time to download their data before access to the site was shut down. Pratt Decl., ¶¶ 9;15. That was the express purpose of the six-month Wind-Down Period. Singh Decl., ¶ 7; Pratt Decl., ¶ 9; Kushniruk Decl., Ex. A, ¶ 10.3.3. During the Wind-Down Period neither party was to accept new accounts and the parties were to

RESPONSE TO MOTION FOR ORDER
TO SHOW CAUSE OR PRELIMINARY
INJUNCTION - 3

MICHELLE PETERSON LAW, PLLC
1420 FIFTH AVENUE, SUITE 2200
SEATTLE, WA 98101

ensure that "[Avalara] Customers [were] able to retrieve their data from Avalara1099." Kushniruk Decl., Ex. A, ¶ 10.3.3.

TechAtlantis continued to provide access and support to Avalara and its customers throughout the term of the Wind-Down Period which expired on September 30, 2016. Pratt Decl, ¶ 15. The Wind-Down Period included an obligation that Avalara continue to pay for the services provided by TechAtlantis. Kushniruk Decl., Ex. A, ¶ 10.3.7. Avalara continued to refuse to make payments on the outstanding invoices or to pay TechAtlantis during the Wind-Down Period. Pratt Decl., ¶ 16. TechAtlantis continued to provide access and support to Avalara's customers, and Avalara continued to pay nothing. *Id.* at ¶ 15-16.

In July 2016, even before the Avalara1099 site was shut down, TechAtlantis received correspondence from an attorney for HRB making a demand for information associated with Avalara1099 that it wanted formatted in a very specific manner. Pratt Decl., Ex. B (HRB "demands the following Client Data be returned immediately in the specified format . . . ."). Counsel for TechAtlantis responded to HRB, explaining that Tech Atlantis had no idea what obligations Avalara had to HRB, as it was not a party to their contract, and that it was impossible to "return" the data in the format demanded, because doing so would require additional development work. Clark Decl, Ex A. Counsel for TechAtlantis explained to HRB that Avalara had full access to all of HRB's customer data, and that any obligation to produce it in a format required by HRB was between Avalara and HRB. *Id.*

D.   **TechAtlantis Extends the Wind-Down Period an Additional Thirty-Days**

In October 2016, after Avalara's first threat to bring an injunction motion against TechAtlantis for the "return of customer data," TechAtlantis agreed to reinstate the Avalara1099 site to the condition it was in prior to the expiration of the Wind-Down Period, for

RESPONSE TO MOTION FOR ORDER
TO SHOW CAUSE OR PRELIMINARY
INJUNCTION - 4

MICHELLE PETERSON LAW, PLLC
1420 FIFTH AVENUE, SUITE 2200
SEATTLE, WA 98101

the sole purpose of allowing Avalara and its customers to access and download any information they needed. Pratt Decl., ¶ 19-20; Singh Decl., ¶ 11-12. TechAtlantis's good faith efforts were for naught. After the expiration of the thirty-day window, Avalara continued to make demands for information and documents it could have obtained during open-access window. Singh Decl., ¶ 12. Once again, Avalara requested more documents and data from TechAtlantis. After the last request, TechAtlantis informed Avalara that it could not respond to additional requests during the tax season beginning on January 1, 2017, because it does not have the manpower to devote to Avalara's demands. Singh Decl., ¶ 13. Moreover, Avalara's non-payment of almost a million dollars created a serious hardship for TechAtlantis. *Id.* Avalara's lack of diligence during the Wind-Down Period and the thirty-day window, created the problems it is now experiencing.

### III.   LEGAL ANALYSIS

Avalara styles this motion as simply one for the return of customer data. Avalara's demands go far beyond accessing the site and "returning" data, however. It is demanding that TechAtlantis create specific documents for each of Avalara's customers in specific forms that do not exist. Singh Decl., ¶ 5. It appears that Avalara is attempting to impose obligations it has to its customer, HRB, on TechAtlantis. Pratt Decl., Ex B; Brown Decl., Ex A. For example, HRB has demanded .csv and pdf files for each of its customers. *Id.* But there are no .csv files or pdfs stored on the Avalara1099 site nor are there "forms" in the possession of TechAtlantis to be "returned." Singh Decl., ¶¶ 5- 6. Providing the information in the format demanded would require hundreds of programming hours. Singh Decl., ¶ 9. Additionally, the format of data that Avalara is demanding would require dismantling the security systems that where designed into the system to specifically ensure the confidentiality of sensitive client data. *Id.*, ¶¶ 9-10. Were

RESPONSE TO MOTION FOR ORDER
TO SHOW CAUSE OR PRELIMINARY
INJUNCTION - 5

MICHELLE PETERSON LAW, PLLC
1420 FIFTH AVENUE, SUITE 2200
SEATTLE, WA 98101

such data to be compromised, TechAtlantis would potentially be liable for a security breach. *Id.*, ¶¶ 9-10; 17. The raw data without the proprietary code developed by TechAtlantis (i.e., the service it provided under the Agreement) would be indecipherable to Avalara and its customers. Singh Decl., ¶ 8. The demand by Avalara is well outside the scope of anything contemplated by the parties when entering into the Agreement.

More importantly, as discussed below, Avalara's demands in the form of a Court ordered injunction based on a claim of replevin has numerous procedural, factual and legal insufficiencies.

### A. Preliminary Injunction Standard

This is a motion for a preliminary injunction based on claim for replevin. For Avalara to obtain preliminary relief, it must show that it is (1) likely to succeed on the merits of its replevin claim; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 399 (9th Cir. 2015) (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). "Preliminary injunctions are an 'extraordinary remedy never awarded as of right." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (quoting *Winter*, 555 U.S. at 24). Courts in the Ninth Circuit employ a "sliding scale" approach to preliminary injunctions. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). "Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.*

### B. Likelihood of Success on Merits of Replevin Claim

Whether the plaintiff is likely to succeed on the merits is the threshold inquiry. "[W]hen 'a plaintiff has failed to show the likelihood of success on the merits, [the court] need not

RESPONSE TO MOTION FOR ORDER
TO SHOW CAUSE OR PRELIMINARY
INJUNCTION - 6

MICHELLE PETERSON LAW, PLLC
1420 FIFTH AVENUE, SUITE 2200
SEATTLE, WA 98101

consider the remaining three *Winter* elements.'" *Garcia*, 786 F.3d at 740 (quoting *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013)) (internal quotations and alterations omitted). Avalara devotes a total of two sentences to its argument that it is likely to succeed on the merits of its replevin claim. Mot. at 9:15-21. Avalara then makes the odd argument that it is likely to succeed on the merits of its "claim for an order" directing the return of its customer data. *Id.* at 9:23-24. While it is not clear what argument Avalara is trying to make with the strength of the merits of its "claim for an order," what is clear is that Avalara has not met its threshold burden of showing that it is likely to succeed on a replevin claim against TechAtlantis.

### 1.     *Avalara Did Not Plead Replevin*

In its counterclaims, Avalara asserts six claims against TechAtlantis: (1) breach of contract and breach of warranty; (2) indemnification; (3) tortious interference with business relationships; (4) conversion; (5) trademark infringement; and (6) unfair business practices. None of which are based on a claim for replevin. Avalara's claim for conversion against TechAtlantis is based on allegations that TechAtlantis "intentionally, wrongfully and willfully interfered with and appropriated the AVA Data." Avalara's Answer, Affirmative Defenses and Counterclaims (Dkt. # 9), ¶ 77. A claim for conversion does not include one for replevin. Pleading one does not include the other. This was made clear by the Supreme Court of Washington over a hundred years ago. *Hall v. Law Guarantee & Trust Soc., Ltd., of London, England*, 60 P. 643, 22 Wash. 305, 310 (1900) ("A claim for conversion is separate and distinct from a claim for replevin.").

Ignoring this fatal flaw to its preliminary injunction motion, Avalara nevertheless argues to this Court that it is "almost certain to prevail on its claim for an order granting it possession of the AVA Data under [a claim for replevin] RCW 7.64.010 *et seq.*" Mot. at 9 (Dkt. # 16). Yet, Avalara offers no explanation to the Court as to why it failed to assert a claim for replevin in the first place or, once realizing its error, sought leave of Court to amend its counterclaims pursuant to Federal Rule of Civil Procedure 15(a)(2). Avalara's failure to assert a

RESPONSE TO MOTION FOR ORDER
TO SHOW CAUSE OR PRELIMINARY
INJUNCTION - 7

MICHELLE PETERSON LAW, PLLC
1420 FIFTH AVENUE, SUITE 2200
SEATTLE, WA 98101

viable claim as the basis for its preliminary injunction motion, even if other claims were asserted in its counterclaims against TechAtlantis, requires that its motion be denied. As explained in *Garcia*, although the plaintiff could have prevailed on other theories, such as the tort claims plead in her complaint, she only sought an injunction on her copyright claim and that is the claim that requires the Court to make a clear finding of likelihood of success. *See Garcia*, 786 F.3d at 740-741.

### 2. *Avalara Seeks Additional Unpaid Services from TechAtlantis*

Granting this injunction would require additional uncompensated work on the part of TechAtlantis. Where a plaintiff seeks a preliminary injunction that alters the status quo and orders a party to "take action," courts construe such requests as seeking a mandatory injunction. *Garcia*, 786 F.3d at 740. Mandatory injunctions are particularly disfavored and should be denied "unless the facts and law clearly favor the moving party." *Id.* As Judge McKeown wrote in *Garcia*, when the proponent of an injunction is seeking the other party to "take affirmative action" the burden of showing likelihood of success on the merits of its claim is "doubly demanding." *Garcia*, 786 F.3d at 740 ("In plain terms, mandatory injunctions should not issue in 'doubtful cases.'") (citing *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011). In *Garcia*, the injunction order granted by the district court would have required Google to affirmatively monitor websites to ensure the plaintiff's video was not being displayed.

Avalara characterizes this motion as a failure to "return" data demanded after the termination of the Wind-Down Period. In reality it is a demand for data that was promised to HRB in a specific form by Avalara well before the Wind-Down Period. Pratt Decl., Ex. B. For reasons unknown to TechAtlantis, Avalara did not or could not provide the data in the form requested by HRB during the Wind-Down Period and is now trying to impose its affirmative

RESPONSE TO MOTION FOR ORDER
TO SHOW CAUSE OR PRELIMINARY
INJUNCTION - 8

MICHELLE PETERSON LAW, PLLC
1420 FIFTH AVENUE, SUITE 2200
SEATTLE, WA 98101

obligations to HRB on TechAtlantis. Avalara had full access to all customer data during the six-month Wind-Down Period, and during the thirty-day period when the site was reinstated. Pratt Decl., ¶¶ 7;9;17;19-20.  Nothing has been withheld from Avalara.  *Id.* at ¶ 7. TechAtlantis does not know what data Avalara or its customers accessed and downloaded during this period. Avalara is essentially demanding that any function that could ever have been performed in Avalara1099 be duplicated and provided to it at TechAtlantis's cost and without compensation. Granting Avalara's motion would force TechAtlantis to create intellectual property for Avalara at no cost to Avalara, while imposing a burden on TechAtlantis that could literally drive it out of business. Singh Decl., ¶¶ 9-10; 14-17. This form of mandatory injunction should be denied as Avalara has not demonstrated that the facts and law favor its position, let alone that it "clearly" favors its position.

### 3. The "Property" at Issue Cannot be "Physically Possessed"

Even if Avalara had made a claim for replevin and even if that claim was likely to succeed on its merits, the "personal property" at issue is data that is stored in the cloud owned by a third-party not named in the lawsuit: Amazon. Because of the security protocols built into Avalara1099, *see* Singh Decl., ¶ 10, in order to access and download the data an individual is required to log into every account and download the information separately. This is the process that Avalara and its customers were to use during the six-month Wind-Down Period.

Pursuant to RCW 7.64.010 only "personal property" is subject to replevin. As explained by Professor Marjorie Dick Rombauer, University Of Washington School Of Law, "the property must be tangible property capable of being physically possessed. Instruments such as promissory notes and securities and other evidences of rights such as account passbooks or deeds can be possessed for purposes of this requirement." 28 Wash. Prac. § 6.67.

The Court's order on replevin would have to direct the Sheriff to take possession of the property and put the plaintiff in possession. RCW 7.64.035(2)(c). Then "[a]fter issuance of the

RESPONSE TO MOTION FOR ORDER
TO SHOW CAUSE OR PRELIMINARY
INJUNCTION - 9

order awarding possession," Avalara would have to "deliver a copy of the bond, . . . and a certified copy of the order awarding possession to the *sheriff of the county where the property is located* and shall provide the sheriff with all available information as to the location and identity of the defendant and the property claimed." RCW § 7.64.045 (emphasis added). TechAtlantis does not know where Amazon Web Services are located but is aware that there are at least 15 geographical regions for Amazon Web Services, including many that are not in the United States.[1]

While the data that was entered into Avalara1099 by the customer is not owned by TechAtlantis, the intellectual property that compiles the data into forms that can be filed with the IRS is owned by TechAtlantis. There is no way to turn over the Amazon Web Service site to Avalara without also turning over the intellectual property that is the bread and butter of TechAtlantis's business. Singh Decl., ¶ 8.

### 4. State Procedures for Replevin

Finally, the first element of a state law claim for replevin is that "the plaintiff is the owner of the property or is lawfully entitled to the possession of the property by virtue of a special property interest."  RCW 7.64.020(2). Although Avalara is correct that the raw data that was entered into Avalara1099 system is owned by Avalara or its customers, it is not seeking the return of that data. It is asking for data to be created, and created in a format that is not identified or defined anywhere within the terms of the Reseller Agreement.

The plaintiff seeking replevin must be able to prevail on the strength of her title or right, regardless of the defendant's title or right to possession. *Crystal Recreation, Inc. v. Seattle Ass 'n of Credit Men,* 34 Wn.2d 553, 558, 209 P.2d 358 (1949). Although Avalara cites to two federal court cases applying RCW 7.64.010 *et seq.* while exercising its diversity jurisdiction, the cases cited by Avalara do not address the novel issue of attempting to seize data from a cloud based service hosted by a third-party provider. In *Alliance Shippers, Inc. v. Always*

---

[1] https://aws.amazon.com/about-aws/ (last visited January 2, 2017) ("U.S., Europe, Brazil, Singapore, Japan, and Australia")

*Transport, Inc.*, a case relied on by Avalara, an unpublished opinion, discussed whether the district court erred in failing to award attorney's fees in a successful action for replevin of a shipping trailer. *Alliance Shippers, Inc. v. Always Transport, Inc.*, 511 Fed. Appx. 678, 679 (9th Cir. 2013); *Alliance Shippers, Inc. v. Always Transport, Inc.*, CV09-3126RMP, 2011 WL 4352310(E.D. Wash. Sept. 16, 2011). The other federal case cited by Avalara, similarly applies a straight forward analysis of the state law of replevin as it relates to insurance proceeds. *See In re Courson*, 409 B.R. 516, 530 (E.D. Wash. 2009). Neither case addresses how a Washington Court would apply the law of replevin to data stored in the cloud and Avalara offers no state law authority addressing replevin in a similar context.

   This case does not involve such straightforward issues as the return of a trailer. In this case, before the Agreement expired, Avalara and Tech Atlantis had equal access to the customer data. Pratt Decl., ¶¶ 7;9. During the term of the Agreement, throughout the Wind-Down Period, and during the thirty-day open access period, Avalara had the ability to access and obtain all of the its customer data. Pratt Decl., ¶¶ 19-20; Singh Decl.,¶¶ 7; 11-13. At some point, Avalara must be responsible for its own failures to perform.

   The provision in the contract on which Avalara relies, Section 10.4, titled "Return of Confidential Information" contemplates the return of any proprietary information that the parties may have exchanged during the course of their business relationship. "Confidential information" covered under this provision is extremely broad and includes "business and technical information, trade secrets, source code, marketing plans" etc. Kushniruk Decl., Ex. A, ¶ 1.7. Section 10.4 also includes the option to "certify as destroyed" the confidential information. *Id.*, at 10.4.

   The Wind-Down Period was specifically included so Avalara would have time to obtain its data. Singh Decl.,¶ 7. Had the parties not been in litigation, the raw data in Avalara1099 would have been destroyed when the Wind-Down Period expired. Singh Decl., ¶ 8. The Wind-Down Period was necessary for Avalara to access the customer data, but it would have to be

RESPONSE TO MOTION FOR ORDER
TO SHOW CAUSE OR PRELIMINARY
INJUNCTION - 11

MICHELLE PETERSON LAW, PLLC
1420 FIFTH AVENUE, SUITE 2200
SEATTLE, WA 98101

destroyed after the contract expired, because the raw data cannot be "returned" in any usable form that does not include Tech Atlantis' proprietary code. Singh Decl., ¶ 8.

### C. Irreparable Harm and Balance of Equities

Avalara created its own harm by failing to access and download the customer data, in the form it wanted, during the Wind-Down Period or during the subsequent thirty-day window. It now wants TechAtlantis to do that work without compensation under the guise of a "return of data" theory. A return of data is not what Avalara and HRB are demanding, however. They demand that the data be turned into a form specific to their clients' needs. *See* Pratt Decl., Ex. B (July 8, 2016 Durone Letter stating that HRB wants the data returned in "immediately in a specific format" including detailed .csv files and pdfs). As explained above, the data is not stored on the Avalara1099 system in specific .csv or pdf files. *See* Singh Decl., ¶ 5. The .csv files and pdf files are too large to be stored on the system so the Avalara1099 system only stores the raw data and then uses its proprietary software to collect, organize and transmit that data to the IRS in the form requested by the customer. *Id.* The Avalara1099 system does not keep a copy of the form because of the storage space that would be required to do that would be prohibitively expensive. *Id.* Tech Atlantis understands that this is the same model that Avalara uses for its own customers and charges its customers for creating forms after the termination of the subscription agreement. *Id.*

Also, TechAtlantis is a small business relative to both Avalara and HRB. Pratt Decl., ¶ 21. It is imperative that TechAtlantis focus on its own business during the tax season and not be responsible for producing forms for Avalara's customers, especially considering that Avalara already owes TechAtlantis approximately $1 million for the work it performed in the past. *Id.* at ¶ 13.

Tech Atlantis has already performed significant work it was not obligated to perform in order to accommodate both Avalara and HRB. *Id.* at ¶ 22. The demand that Avalara is asking the Court to impose on TechAtlantis would place the entire business at risk because it would

RESPONSE TO MOTION FOR ORDER
TO SHOW CAUSE OR PRELIMINARY
INJUNCTION - 12

MICHELLE PETERSON LAW, PLLC
1420 FIFTH AVENUE, SUITE 2200
SEATTLE, WA 98101

require significant new development efforts at extreme time and expense, during the busiest time of the year for tax season. *Id.*; Singh Decl., ¶¶ 9-10; 14-17.

It appears that Avalara made promises to its clients that it would store their tax data in a specific form and make it available to their client upon demand. The Agreement with TechAtlantis gave Avalara six-months (which turned into an eight-month period with a one-time extension of thirty-days) to access their clients' data and download it in the format that they needed. Avalara appears to have decided not to do this work on behalf of its clients and is now asking the Court to force TechAtlantis to do the work without compensation.

To comply with Avalara's demand would be at enormous expense to Tech Atlantis. Tech Atlantis estimates the expense at approximately $450,000, based on a cost estimate of $150,000 for manpower, $100,000 for data hosting; and a $200,000 loss in opportunity cost in having to divert all its efforts away from its current business, all the while at risk of losing the customers they are currently servicing. Singh Decl., ¶ 14. Avalara makes this demand, after having already created a significant financial hardship in failing to pay the almost $1 million it owes to Tech Atlantis. Singh Decl., ¶ 13.

D.      **Public Interest**

TechAtlantis agrees that there are customers that may not have reliable and quick access to their 1099 forms that were created on the Avalara1099 system. This is not because TechAtlantis is holding their data hostage, however. It is because either Avalara failed to inform its clients that they should save copies of their forms or it promised to save forms for its clients and failed to do so. In either scenario, TechAtlantis is not the party that made the promises to Avalara's customers and should not be responsible for creating and sending specific forms to each of Avalara's customers.

It is possible that Avalara did not create and save the forms for its customers because it realized that it would be a labor-intensive process. As explained in the Sanjeev Singh

RESPONSE TO MOTION FOR ORDER
TO SHOW CAUSE OR PRELIMINARY
INJUNCTION - 13

MICHELLE PETERSON LAW, PLLC
1420 FIFTH AVENUE, SUITE 2200
SEATTLE, WA 98101

Declaration, as a result of the security measures inherent in the Avalara1099 system, all customer data must be siloed in the system with no mechanism for collecting data across all customer files. Singh Decl., ¶ 6. Thus, Avalara needed to inform its clients that they only had six-months to login and download the forms they wanted or Avalara needed to log into each customer's account and download the forms. That process was solely in Avalara's control, and Tech Atlantis has no information regarding how or whether it notified its customers of the fact that their access to Avalara1099 would be shut down. Pratt Decl., ¶ 17. The fact that Avalara made the decision to forgo creating the forms it believed it needed to service its customers was its own decision, and that decision has apparently created Avalara's problems with HRB.

If TechAtlantis is forced to comply with Avalara's demands, there is a serious risk that client data could be compromised. Singh. Decl., ¶¶ 9-10. Producing the data in the form demanded by HRB would require Tech Atlantis to dismantle the security systems that are in place to prevent such a breach. *Id.*, at ¶ 9. It is not in the public interest to place the sensitive tax information of Avalara1099 users at risk. The risk is also extremely prejudicial to Tech Atlantis, because as the party performing the work, and potentially placing the data at risk, they could incur significant liability for any resulting damage. *Id.*, at ¶ 17.

E.   **Bond**

Avalara suggests that its requests for the return of the data is nothing more than turning over AVA Data in its possession and therefore no bond is necessary. As discussed above, that is not the case. Avalara is demanding, not the return of documents in Tech Atlantis's possession, but the creation of documents and reports that do not exist, in a format that the Avalara1099 system is currently incapable of producing. An estimate of the manpower, data hosting, and lost opportunity is roughly $450,000. Singh. Decl., ¶ 14. This estimate does not include the potential liability risk associated with the required dismantling of Avalara1099's

RESPONSE TO MOTION FOR ORDER
TO SHOW CAUSE OR PRELIMINARY
INJUNCTION - 14

MICHELLE PETERSON LAW, PLLC
1420 FIFTH AVENUE, SUITE 2200
SEATTLE, WA 98101

security protocols. *Id.* at ¶ 9. Should the data be compromised the liability risk to Tech Atlantis could be extreme. The estimate also does not include the very serious risk that the diversion of all of TechAtlantis's resources to respond to Avalara's demands could put them out of business. Pratt Decl., ¶ 22; Singh. Decl., ¶ 17. Should the Court grant Avalara's motion, a bond for at least $1,000,000 should be imposed to cover the associated costs and risk to TechAtlantis.

## IV.   CONCLUSION

Avalara's motion should be denied. As a threshold matter, Avalara seeks an injunction based on a claim of replevin that has never been asserted. Because one cannot succeed on a claim that was not plead, the Court need not consider the remaining preliminary injunction elements. Assuming Avalara could overcome this drastic legal deficiency, replevin is not possible as the property in question cannot be physically possessed nor can it be located and turned over to the sheriff in the county. And, even if it could show likelihood of success on its replevin claim, the equities do not favor Avalara. Avalara has not paid TechAtlantis, a much smaller company, the money that TechAtlantis earned under their Agreement. It failed to act to download customer data in the form it wanted during the Wind-Down Period or the thirty-day window. And now claims that this is TechAtlantis's fault and TechAtlantis should be required to do this work on behalf of Avalara's customers – without compensation. A mandatory injunction of this nature would essentially put TechAtlantis out of business and reward Avalara for its dilatory conduct and nonpayment of monies owed. Tech Atlantis respectfully requests the motion be denied.

/

/

/

DATED:  January 3, 2017

MICHELLE PETERSON LAW, PLLC

By  *s/Michelle Peterson*
Michelle Peterson, WSBA No. 33598
michelle@michellepetersonlaw.com
Michelle Peterson Law, PLLC
1420 Fifth Avenue, Suite 2200
Seattle, WA  98101
(206) 224-7618

Suzanne G. Clark *Pro Hac Vice*
Sclark@clark-firm.com
Clark Law Firm, PLLC
244 West Dickson Street, Suite 201
P.O. Box 4248
Fayetteville, AR 72702-4248
479-856-6380

*Attorneys for Zenwork, Inc. f/k/a Techatlantis, Inc.*

RESPONSE TO MOTION FOR ORDER
TO SHOW CAUSE OR PRELIMINARY
INJUNCTION - 16

MICHELLE PETERSON LAW, PLLC
1420 FIFTH AVENUE, SUITE 2200
SEATTLE, WA 98101

**CERTIFICATE OF SERVICE**

I hereby certify that on January 3, 2017, I electronically sent the foregoing to the following at the email designated below:

Michael P Brown
GORDON TILDEN THOMAS & CORDELL LLP
1001 4TH AVE
STE 4000
SEATTLE, WA 98154
206-467-6477
mbrown@gordontilden.com

Jeffrey M Thomas
GORDON TILDEN THOMAS & CORDELL LLP
1001 4TH AVE
STE 4000
SEATTLE, WA 98154
206-467-6477
jthomas@gordontilden.com

Dated: This 3rd day of January 2017.

                                                  */s/ Michelle Peterson*
                                                  Michelle Peterson