UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ZENWORK, INC. f/k/a TECHATLANTIS, INC., <br><br> Plaintiff, <br><br> v. <br><br> AVALARA, INC., <br><br> Defendant. | Case No. 16-01325-RAJ <br><br> ORDER |
| AVALARA, INC., <br><br> Counterclaim Plaintiff, <br><br> v. <br><br> ZENWORK, INC. f/k/a TECHATLANTIS, INC. d/b/a EXAKTO.COM; 1099ONLINE.COM, TAX1099.COM; EZ2290; EZIFTA; EZEXTENSION; and FBARONLINE, <br><br> Counterclaim Defendants. | |

ORDER - 1

This matter comes before the Court upon Defendant Avalara, Inc.'s Partial Motion for Summary Judgment. Dkt. # 38. Plaintiff Zenwork, Inc. (formerly known as Tech Atlantis) opposes the motion. Dkt. # 42. Having considered the submissions of the parties, the relevant portions of the record, and the applicable law, the Court finds that oral argument is unnecessary. For the reasons that follow, the Court **GRANTS** Defendant's Motion.

## I. BACKGROUND

Plaintiff is a provider of web-based corporate tax calculation and filing services. Dkt. # 1. Defendant provides web-based services for data collection and electronic filing of employment income returns. *Id.* at ¶ 6. On November 24, 2014, Plaintiff and Defendant entered into a Reseller Agreement (the "Agreement"). *Id.* at ¶ 8. Under the Agreement, Plaintiff would provide web-based services for the preparation and filing of IRS 1099 forms and other IRS tax forms, Defendant would brand Plaintiff's website and services with its own name, and then Defendant would market and sell the service as "Avalara1099". *Id.* at ¶ 9. Defendant would then collect the revenue from customers of Avalara1099 and pay a portion of that revenue to Plaintiff. *Id.*

Avalara1099 customers could purchase "add-on" services in addition to the basic online form-filing service. One such add-on service was called Enterprise. Enterprise allowed a customer to assign specific rights to different users. For example, a customer could allow a supervisor to access their employees' data but not allow the employees to access each other's data. Dkt. ## 39, 45. Plaintiff would then invoice Defendant for 40% of the purchase price of these additional services. Dkt. # 1 Ex. A.

The Agreement also allowed Defendant to sell Avalara1099 Prepaid Forms ("Prepaid Forms") separately from the Avalara1099 website. Avalara1099 accounts were provisioned for the use of Prepaid Forms. Defendant was allowed to "set customer pricing, process orders, collect payment and process all cancellations with

ORDER - 2

respect to the Prepaid Forms." *Id.* Defendant agreed to pay Plaintiff $0.60 per form for the first 200,000 Prepaid Forms ordered by Defendant for Avalara1099 each sales year and $0.45 for each Prepaid Form above the first 200,000. Defendant also agreed to pay Plaintiff "an annual fee of $75 for each customer that purchases Enterprise services (i.e. enterprise workflow and rights management features)." *Id.*

At some point after the parties entered into the Agreement, Defendant made the decision to bundle additional services, including Enterprise services, into Avalara1099. Every customer that purchased Prepaid Forms and through those forms, Avalara1099 services, also received Enterprise services. Dkt. # 39 Ex. 1. On October 15, 2015, Defendant entered into a contract with H&R Block Tax Group, Inc. ("H&R Block"). Dkt. # 40. H&R Block purchased Avalara1099 services for its own internal corporate use and for use by its individual franchise offices. *Id.* Under the terms of H&R Block's agreement with Defendant ("HRB Agreement"), H&R Block would pay $0.60 per Prepaid Form for the first 45,000 forms used, and $1.50 per Prepaid Form after that. *Id.* H&R Block agreed to be invoiced for 20,000 Prepaid Forms upon execution of the HRB Agreement, with any Prepaid Forms in excess of 20,000 to be charged as incurred. Dkt. # 43 Ex. E. H&R Block received use of the Avalara1099 services, and through bundling, Enterprise services, in exchange for this initial purchase. H&R Block then made these services available to its individual franchise offices at no charge. Dkt. # 41.

In January of 2016, Plaintiff notified Defendant that it wished to terminate the Agreement and sought to renegotiate its terms. Dkt. # 1. On March 28, 2016, Plaintiff sent invoices to Defendant for its share of revenues from sales of Avalara1099 from May of 2015 through February of 2016. Dkt. # 39 Ex. F. Plaintiff invoiced Defendant $75 for each of the 7,169 H&R Block franchise offices that had access to Enterprise services. *Id.* Defendant refused to pay the invoiced $534,000, arguing that H&R

ORDER - 3

Block was one "customer" that purchased Enterprise services and that pursuant to the Agreement, it owes Plaintiff one $75 fee for that purchase. In Defendant's Motion, it requests that the Court grant partial summary judgment on the issue of Plaintiff's entitlement to Enterprise service fees with respect to H&R Block's purchase of Avalara1099. Dkt. # 38.

## II. LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325. If the moving party meets the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial in order to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).

## III. DISCUSSION

In Washington, contract interpretation is a question of law. *Tanner Elec. Coop. v. Puget Sound Power & Light*, 128 Wash.2d 656 (Wash. 1996). In a contract case, summary judgment is proper "if the written contract, viewed in light of the parties'

objective manifestations, has only one reasonable meaning." *Wm. Dickson Co. v. Pierce Cnty.*, 128 Wash.App. 488, 492 (2005). Where interpretation "depend[s] on the use of extrinsic evidence," or the extrinsic evidence admits more than one "reasonable inference," the court cannot interpret the contract as a purely legal matter. *Brotherson v. Prof'l Basketball Club, L.L.C.*, 604 F. Supp. 2d 1276, 1286 (W.D. Wash. 2009).

As noted above, Section 5.3.2 of the Agreement states that Defendant "shall pay [Plaintiff] an annual fee of $75 for each customer that purchases Enterprise services (i.e. enterprise workflow and rights management features)." Dkt. # 1 Ex. A. An "AVA Customer" is defined as "any and all Customers of any AVA [Avalara] product (including, without limitations, the AVA-branded Tax1099 Service [Avalara1099]). *Id.* According to the plain language of the contract, Defendant must pay Plaintiff $75 for any and all customers of any Avalara product that purchases Enterprise services.

H&R Block purchased Avalara1099 Prepaid Forms and received Avalara1099 and Enterprise services. These Prepaid Forms were then used by 7,169 of its individual franchise offices. Dkt. # 39. Plaintiff agrees that the plain language of the Agreement states that Defendant is obligated to pay Plaintiff a $75 fee for each customer who purchases Enterprise services, but argues it was Defendant's intent to charge each individual customer who uses the Enterprise services, and that each of the H&R Block offices that utilized Enterprise services are customers. Dkt. # 42. However, "the subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used. We generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wash. 2d 493, 503–04 (2005). Plaintiff cannot argue that its' interpretation relies on

the plain language of the Agreement while asking the Court to infer Defendant's intent through the use of extrinsic evidence. Dkt. # 42.

At issue here is not the definition of a "customer" under the Agreement, but the definition of "purchase". Whether or not each H&R Block office is a customer is irrelevant unless each customer, by definition, is a "customer that purchases Enterprise services." "Customer" as defined by the Agreement contains no such additive. The term "purchase" is not defined in the Agreement but there is no legal ambiguity as to its definition. The ordinary and usual meaning of "purchase" is "the act or an instance of buying". *Purchase*, Black's Law Dictionary (10th ed. 2014). Here, H&R Block's franchise offices did not engage in the act of buying Enterprise services. It follows that they did not individually purchase Enterprise services, regardless of whether they meet the Agreement's definition of customer. H&R Block, as one customer, purchased the Avalara1099 services and through that transaction, purchased Enterprise services[1]. On this issue, there is no genuine dispute of material fact as to the interpretation of the Agreement, thus partial summary judgment is appropriate.

### IV. CONCLUSION

For all the foregoing reasons, the Court **GRANTS** Defendant's motion for partial summary judgment. Dkt. # 38.

Dated this 19th day of September, 2017.

_Richard A. Jones_

The Honorable Richard A. Jones
United States District Judge

---

[1] Even if the Court found that consideration of extrinsic evidence was necessary, it applies only "to determine the meaning of specific words and terms used and not to show an intention independent of the instrument or to vary, contradict, or modify the written word." *G Vincent Ltd. v. Dux Area Inc.*, No. C09-383RAJ, 2011 WL 62136, at *4 (W.D. Wash. Jan. 6, 2011). The parties offer no extrinsic evidence on the meaning of the terms in Section 5.3.2 of the Agreement.